

# The Attorney General of Texas

November 3, 1977

JOHN L. HILL
Attorney General

Supreme Court Building
P.O. Box 12548
Austin, TX. 78711
512/475-2501

701 Commerce, Suite 200
Dallas, TX. 75202
214/742-8944

4814 Alberta Ave., Suite 160
El Paso, TX. 79905
915/533-3484

723 Main, Suite 610
Houston, TX. 77002
713/228-0701

806 Broadway, Suite 312
Lubbock, TX. 79401
806/747-5238

4313 N. Tenth, Suite F
McAllen, TX. 78501
512/682-4547

200 Main Plaza, Suite 400
San Antonio, TX. 78205
512/225-4191

An Equal Opportunity
Affirmative Action Employer

Honorable Jerry Donaldson
Chairman - Committee on Financial
  Institutions
House of Representatives
Austin, Texas

Dear Mr. Donaldson:

Opinion No. H- 1084

Re: Authority of Texas
credit union to partici-
pate in share draft pro-
grams and application of
prohibition on branch
banking thereto.

You have asked this office to determine the following questions:

1. Whether State chartered credit unions in Texas are legally authorized to participate in share draft programs.

2. If State chartered credit unions can participate in share draft programs, can a credit union utilizing a share draft program engage in business in more than one place without violating Article 16, Section 16 of the Texas Constitution.

The share draft question is very complex, and there are new developments almost daily.

At the present, approximately thirty-six state and federally chartered credit unions in Texas are offering their membership "quick-accounts" or "share drafts," a form of third party remote withdrawal of funds deposited with the credit union. A share draft has been described as a financial instrument which enables a credit union member to withdraw funds from his credit union share account without going to the credit union. The draft can be used to obtain cash, pay a bill, or make a purchase. A share draft is payable through a bank which processes the withdrawal in a manner similar to a check. Washington Financial Reports,

Number 41, Page A-24, October 11, 1976.  The National Credit Union Administration has defined "share draft" in its proposed rules governing share draft programs as follows:

> "Share draft" means a negotiable or non-negotiable draft or other order which is payable through a bank and is used to withdraw shares from a share draft account.

42 Fed. Reg. 11248 (1977).

This controversy is neither peculiar nor limited to the State of Texas; rather, the issue is receiving nationwide attention. In addition, the Antitrust Division of the United States Department of Justice has urged the adoption of third party withdrawal powers for credit unions.

To gain perspective on this matter, regulatory authorities and trade association representatives among banking and credit union groups in Texas, other states and on the national level have been contacted; additionally, trade journals and periodicals which are readily available were consulted and relevant statutory and constitutional authorities have been reviewed.

I.

BACKGROUND

In October of 1974, the National Credit Union Administration (NCUA) gave initial approval to share draft programs on a pilot and experimental basis for three federally chartered credit unions in the states of California, Georgia and Michigan.  The prototype share draft programs approved by NCUA were developed by the Credit Union National Association (CUNA) through its wholly owned subsidiary I.C.U. Services Corporation.

Subsequent to this initial approval, NCUA, pursuant to individual credit union application, has approved share draft programs for federal credit unions in each of the fifty states and the District of Columbia.  The NCUA, in response to a suit by the American Bankers Association, has elected to promulgate new rules for the implementation of share draft accounts for federally chartered credit unions.  The proposed rules were published in the Federal Register, 42 Fed. Reg. 11247 (1977). The bankers have dismissed their suit against the NCUA, but have indicated that a new action will be brought if the proposed rules governing share drafts are adopted.  The rules are being reviewed by the general counsel's office of the NCUA.

In addition, state chartered credit unions in approximately twenty-six states, including Texas, have initiated similar programs, either with administrative approval, legislative action, or upon independent initiative without seeking any specific approval.  In several states, opinions were sought from the State Attorney General.  At present, approximately 1000 credit unions across the country, roughly half of them state chartered, are offering share draft programs.  In the month of October, 1976, some 61-1/2 million dollars of share drafts were issued by these credit unions; this represents 1,208,402 share drafts paid during October with an average amount per draft of $50.61; this indicates an annualized amount of share draft volume of 3/4 billion dollars.  Credit union industry spokesmen claim that the number of credit union participants and the volume of share drafts issued is increasing at a rapid rate.

## II.

## DEVELOPMENTS IN OTHER JURISDICTIONS

As was noted above, the credit union share draft program has raised issues having a national import.  In a number of states, state regulatory authorities have become directly involved in legal questions concerning this matter.  In most instances, local banking associations have sought through administrative procedures or direct court action to prohibit the participation of credit unions in such programs.

### A.  Litigation

1.  Federal.  The American Bankers Association and a small New York state chartered bank, the Tioga State Bank, filed a petition in Federal District Court in Washington, D.C., styled American Bankers Ass'n v. Montgomery, Civil Action No. 76-1661, against the National Credit Union Administration, alleging, inter alia, that in approving the pilot program, the NCUA failed to comply with various provisions of the Federal Administrative Procedures Act; that commercial banks had been damaged and would continue to be damaged by the unlawful action of NCUA in approving the share draft programs, and that, further, various federal statutes concerned with banks should be interpreted to exclude all financial institutions other than chartered banks from participating in third party funds withdrawal systems.  The case was subsequently dismissed by the bank and the American Bankers Association when the NCUA agreed not to expand the pilot program until new rules had been adopted.  The rules are under consideration by the NCUA at the present time.

2.   Iowa.   The Iowa Department of Banking determined that state credit unions could not issue share drafts.  The district court in Cause No. CE6-3152, Iowa Credit Union League v. Iowa Dep't of Banking (Iowa D.Ct. Polk Co., 5/24/77), relying on statutes similar to those of Texas, rejected the State Banking Department's contention that credit unions could not participate in share draft programs.  The Court noted that there was nothing in the Iowa law that specifically prohibited share drafts, that the use of share drafts does not constitute an unauthorized banking business, and that share drafts are not checks.

3.   Michigan.   The Michigan Financial Institutions Bureau entered an administrative order which held that state chartered credit unions could engage in share draft programs. The Michigan Bankers Association has challenged this order in State court in Michigan Bankers' Ass'n v. Comm'r of Financial Institutions Bureau, Cause No. 77-20045-AA (Ingham Co. Cir. Ct.).

4.   Oklahoma.   On November 5, 1976, an Oklahoma District Court dismissed an action brought by the Oklahoma Bankers Association against various Oklahoma credit unions and the State Credit Union Board, styled Cause No. CD-76-988, Oklahoma Bankers Ass'n v. Oklahoma State Credit Union Board.  The Oklahoma Bankers Association's action was dismissed on the ground that the bankers had failed to exhaust their administrative remedies before the Credit Union Board prior to bringing its lawsuit.  An administrative appeal was taken and the State Credit Union Board held that the credit unions could engage in share draft programs.  The bankers have filed suit in Cause No. CD-77-623, Oklahoma Bankers Ass'n v. Oklahoma State Credit Union Board.

B.   Attorney General Opinions

The following state attorneys general have issued opinions concerning the legality of share draft accounts for state chartered savings and loan associations:

1.   Arkansas.   In 1976, the Attorney General of Arkansas issued an opinion in which he determined that a credit union's issuance of share drafts would violate a section of the Arkansas Credit Union Code which provides:

> "No credit union shall carry on a banking business, or carry any demands, commercial or·checking accounts."

Opinion No. 76-111 (1976) at 2.   The Attorney General recommended the credit unions attempt to enact remedial legislation to permit such programs.   Id. at 3.

2.   North Carolina.   On October 28, 1975, the Attorney General of North Carolina issued an opinion in which he determined that share draft programs are lawful under the statutes of that state.   The statutory language therein construed is similar to the language contained in the Texas Credit Union Act.   The North Carolina opinion holds that a share draft is not a check because it is not drawn on a bank, and this finding is based upon the North Carolina version of the Uniform Commercial Code, codified as N.C. Gen. Stat. § 25-3-104(2)(b).   This is identical to Section 3.104(b)(2) of the Texas Business and Commerce Code (the Texas Uniform Commercial Code) and provides that "[a] writing which complies with the requirements of this section is . . . a 'check' if it is a draft drawn on a bank and payable on demand. . . ."   The North Carolina opinion states that credit union statutes provide that shares in deposit shall be transferred in such a manner as the Board of Directors through the by-laws prescribed, with the approval of the Credit Union administration.   This can be compared to the Texas Credit Union Code which provides analogous authority and uses the same language with respect to withdrawals and transfer of shares by the adoption of by-laws with the approval of the Commissioner for that purpose.

3.   Ohio.   On August 2, 1976, the Attorney General of Ohio issued an opinion in which he determined that share drafts are lawful under Ohio law.

4.   Utah.   In an opinion issued September 10, 1975, the Attorney General of Utah has determined that share drafts are lawful under Utah law.   The Utah opinion follows the same rationale as that of the North Carolina opinion, including the Uniform Commercial Code argument.

5.   Washington.   The Attorney General of Washington has expressed an opinion that share draft programs are not lawful in that state.   AGLO 1977 No. 28.   The Washington Share Draft Program did not follow the I.C.U. prototype and was rather unique.   A second share draft program similar to the traditional I.C.U. prototype was approved on September 29, 1977.   AGLO 1977, No. 40.

C.   Legislation

1.   Georgia.  Section 41A-3101(a) of the Annotated Code of Georgia has been interpreted by the Georgia Supervisor of Credit Unions as prohibiting share drafts.

2. _Idaho_. Prior to August 1, 1977, Idaho did not have a specific statute authorizing share accounts. A new credit union act became effective on August 1, 1977, and specifically provides for share draft type accounts. Section 26-2108(t) of the Idaho Code specifically grants to credit unions the power to "[p]rovide for their members, share and deposit accounts from which the member may withdraw funds by the use of a negotiable instrument."

3. _Massachusetts_. Chapter 167, Section 16A, of the Annotated Laws of Massachusetts, specifically authorizes credit unions to set up negotiable withdrawal order accounts subject to regulations promulgated by the Commissioner.

4. _Minnesota_. In Minnesota, specific statutory authority allows State-chartered credit unions to engage in share draft programs without prior approval from the Commissioner of banks; no regulations have been promulgated under this statute. It should be noted, however, that the statute although permitting share withdrawals does not authorize the establishment of "demand deposits". Subsection 11 of Section 52.04 of the Minnesota statutes provides:

> Upon written authorization from a member,
> retained at the credit union, to make
> payments to third parties by withdrawals
> from the member's share or deposit accounts
> or through proceeds of loans made to such
> member, or by permitting the credit union
> to make such payments from the member's
> funds prior to deposit; to permit draft
> withdrawals from member accounts; however,
> this clause does not permit a credit union
> to establish demand deposit (checking
> accounts) for its members...."

5. _Montana_. Section 14-613 (16) of the Montana Credit Union Act, Mont. Rev. Codes Ann. § 14-601 _et seq_., now contains a specific prohibition against credit unions providing "checking account services." Previously, Montana law was interpreted to permit the issuance of share drafts.

6. _Nebraska_. As of September 1, 1977, Nebraska Credit Union laws were amended, and pursuant to Section 21-1773 of the Revised Statutes of Nebraska, a credit union may engage in electronic fund transfer programs. (Most share draft systems utilize some form of electronic fund transfer.)

7.  Nevada.  Section 678.470 of the Nevada Credit Union Laws, Nev. Rev. Stat. § 678.010 et seq., specifically provides:

>A credit union may, subject to the regulations or approval of the commissioner:
>
>(1)  Receive from its members or from the members of another credit union deposits which are payable on demand and to honor request for withdrawals in the form of checks or drafts.

## D.  Administrative action

1.  Informal approval:  In several states, state chartered credit unions have initiated share draft programs with the knowledge of the regulatory authority charged with the supervision of credit unions.  In these instances, the regulatory authority has allowed the programs to be initiated and continue without requiring notification or application of any sort; neither has the regulatory authority adopted any rules or regulations with respect to share draft programs. These states are:

>a.  Alabama (Alabama Banking Department);
>
>b.  Colorado (Colorado State Bank Commissioner);
>
>c.  Indiana (Department of Financial Institutions).

2.  Formal approval:  In a number of jurisdictions, the state regulatory authority does require some form of notification or application and in some instances has adopted rules, regulations or specifications with respect to share draft programs.

>a.  California.  The California Department of Corporations requires a written application from each credit union desiring to participate in a pilot share draft program. Currently, the department limits each participating credit union to a maximum of 200 share draft accounts, approves the pilot program for an additional 3 month period with the option of extensions thereafter.  Additionally, the department requires the credit union to maintain liquidity reserves in a back-up line of credit against share draft balances.
>
>b.  Connecticut.  The State Banking Department on April 18, 1976, approved the written request of two state chartered credit unions by advisory letter.  Connecticut has

no formal regulations for procedures and exercises no author-
ity with respect to specifications or share draft programs.

c. Florida.  Although the State Comptroller ordered
state credit unions to cease share draft programs, the credit
unions perfected an administrative appeal.  The credit unions
prevailed in Case No. 76-2091, Leon County Teachers Credit
Union v. Dep't of Banking and Finance.  The administrative
judge held that the law was silent as to whether share drafts
could be used by credit unions, and therefore a specific rule
must be promulgated to eliminate them.

d. Kentucky.  A hearing was held on November 1,
1977, on a proposed regulation of The Commissioners of Banking
to authorize a share draft program.

e. Illinois.  The Illinois Department of Financial
Institutions has agreed to approve several State chartered
credit unions for experimental share draft programs; the state
has adopted guidelines for approval of share draft programs
and requires that a written request be submitted to the depart-
ment prior to the initiation of the program.  It should be
noted that the Illinois Credit Union Law in Section 496.10
specifically prohibits a credit union "from engaging in the
banking business."  Ill. Ann. Stat. ch. 32, § 496.10.

f. Indiana.  The Indiana department has not
adopted any share draft procedures or regulations.  However,
several Indiana State chartered credit unions are conducting
share draft programs, even though they have not sought formal
approval from the Department of Financial Institutions.  Par-
ticipating credit unions have notified the Department of their
activities.

g. Michigan.  The Michigan department has autho-
rized credit unions to engage in share draft activities.
The question is presently under litigation.

h. Missouri.  The Missouri division of credit
unions requires notification and application and has recommended
that state chartered credit unions adhere to the specifications
contained in the I.C.U. prototype.

i. Pennsylvania.  The Pennsylvania Department of
Banking has by letter notified the Pennsylvania Credit Union
League that it will approve share draft programs conducted
according to specifications prepared by the Department of
Banking.  The Pennsylvania statute is silent as to the mechanisms

by which members may withdraw from their accounts, and therefore the Pennsylvania Banking Department has determined that as there is no prohibition against the use of a share draft account, such accounts are permissible for state chartered credit unions.

   j. Virginia. Although no specific statute authorizes share accounts, the Department of Business Regulation, Banking Division, State of Virginia, has approved a share draft program for credit unions.

   k. Wisconsin. The Wisconsin Supervisor of the Division of Savings and Loans for the State of Wisconsin has authorized the use of share draft accounts for credit unions.

III.

### THE SITUATION IN TEXAS

  At present, approximately thirty-six credit unions, both federally and state chartered, are offering share draft programs in Texas.  The exact number of State chartered credit unions offering such programs is not known because none have sought the approval of the Credit Union Commission before implementing share drafts. The Credit Union Commission has not required prior approval, relying upon provisions of the Texas credit union statutes and the uniform by-laws for credit unions adopted by the Commission pursuant to its statutory authority.

  Article 2461-6.02(a) of the credit union statutes, V.T.C.S. art. 2461-1, et seq., provides:

> Share accounts consist of payments made
> by members on shares, all of which are
> common shares of one class, subscribe, paid
> for, and transferred in the manner prescribed
> by the by-laws.

(Emphasis added).  Article 2461-11.07(a) provides:

> The commissioner, with the approval of
> the commission, shall promulgate general
> rules and regulations pursuant to this
> Act. . . . The rules and regulations shall
> apply to all credit unions organized under
> this Act.

Article 2461-2.03(c) vests in the Commissioner the authority to investigate <u>inter alia</u>, the by-laws of a credit union to determine whether such conform with the Act; Article 2461-2.06 allows for amendment of the by-laws upon application to and approval by the Commissioner. Pursuant to this statutory authority, the Commissioner with the approval of the Commission promulgated as a part of the standard by-laws, Section 6.02(3), which provides in pertinent part:

> "[T]he board of directors shall have the right at any time to prescribe rules regarding <u>remote withdrawal of shares and/or deposits in accordance with regulations promulgated by the Credit Union Commissioner.</u>"

(Emphasis added). To date, the Credit Union Commission has promulgated no rules or regulations with respect to the withdrawal of shares, believing that such are not necessary. The Commission did adopt a resolution on December 14, 1977, re-affirming their position and instructed the Credit Union Commissioner to explore the need for new regulations for the orderly development of fund transfer systems.

A.   The Credit Unions' Position

The credit unions have taken the position that share drafts are permitted under State law. Through the Texas Credit Union League they have filed a very detailed brief in support of their position. They base their position on the general authority granted to credit unions under the Texas Credit Union Act, especially Article 2461-4.01 and Article 2461-4.02, V.T.C.S. These Articles relate to general powers possessed by the credit unions including the power to make contracts; receive payments from members; to collect, receive and disburse money; and to have such incidental powers as are necessary for the conduct of its business.

The credit unions concede that there is no specific authority for the issuance of share drafts, but also point out that there is no specific prohibition against the issuance of share drafts either. The credit unions point out that a bank is not expressly authorized under State law to accept checks.

The credit unions have relied on their authority to disburse funds as provided by the board of directors through by-laws. Such authority has been approved by the Credit Union Commission in approving section 2.06 of the standard by-laws.

In further support of this position, the credit unions have relied upon the approval in February of 1968 by then Banking Commissioner of Texas, (the approval was by the Credit Union Supervisor, then an employee of the Banking Department) of an amendment to the credit union by-laws of the Humble Employees Credit Union of Baytown, Texas, providing for remote withdrawal of credit union shares by members through the use of share drafts. That amendment as then approved provided in pertinent part:

> Money paid in on shares, or installments of shares in excess of $200.00 or on deposit shares provided the member has $200.00 or more in on shares, may be withdrawn by members who, from time to time, are designated by the Credit Committee, by the drawing of drafts by such member on the credit union as drawee upon draft forms approved by the Board of Directors and supplied to the member.

## B.   The Banker's Position

In its letter of November 8, 1976, addressed to Commissioner Parsons, Commissioner Stewart, and Attorney General Hill, the Texas Bankers Association (TBA) asserted that "it goes without argument that both our Constitution and our statutes contemplate that there should be distinct differences between the legal functions of commercial banks and the so-called thrift institutions." (Emphasis added). Further, the TBA asserts that "very significant statutory differences" exist among banks and other "thrift institutions", including capital requirements, chartering procedures, and tax liabilities. The credit union share draft program, the bankers maintain, "is purposely designed to eliminate this distinction." In addition to urging that credit unions do not have lawful authority to participate in share draft programs, and in the alternative, the TBA takes the position that if credit unions have the authority to initiate and continue share draft programs, then they are subject to article 16, section 16 of the Texas Constitution prohibiting corporate bodies from exercising banking and discount privileges in more than one place, i.e. the prohibition of branch banking. Specifically in this context, the TBA complains of the operation by Government Employees Credit Union of automated teller machines at various locations in San Antonio.

In support of its position and its alternative position, the TBA provided this office with a memorandum of law entitled "Memorandum Discussion Bearing Upon the Authority of State Chartered Credit Unions to Issue Share Drafts", prepared for the board of directors of the Texas Bankers Association. Briefly, the contentions made therein are as follows:

(i)   Relying upon the Texas Credit Union Act and the specific purposes stated therein for the existence of credit unions, the TBA memorandum emphasizes that the primary purpose of credit unions is to be a savings or thrift institution; and this traditional definition, the TBA contends, precludes expansion of, or any legislative intent to allow the expansion of, credit unions into the area of share draft programs. "The terms saving and spending are wholly incompatible. When credit union activity shifts in the direction of encouraging spending, this represents a radical departure from the traditional concepts." (Page 9, TBA Memorandum of Law).

(ii)  The TBA memorandum asserts that "[t]he legislative scheme into which each type of financial institution must find its prescribed niche is both complex and delicate. Unilateral alteration of any one niche without regard for the impact of such change upon the structure as a whole could create a dangerous imbalance. Banks, credit unions, and savings and loan associations have been created by legislative action and their respective powers have been defined by the legislature." (Page 10, TBA Memorandum of Law). Consequently, TBA claims that the institution of share draft programs exceeds any authority heretofore vested in credit unions by the legislature and is so radical a departure from historical and traditional concepts that only the "express sanction of the legislature" could make such programs lawful in this State;

(iii) Citing to a number of court opinions from Federal, Texas, and other state jurisdictions, the TBA asserts that the taking of deposits is an essential definition of a "banking business"; "[t]his principle [is] reaffirmed by the court as late as 1963, in the

case of U.S. v. Philadelphia National Bank, et al., 374 U.S. 321, as follows:

> 'Commercial banks are unique among financial institutions in that they alone are permitted by law to accept demand deposits.'"  (Page 11, TBA, Memorandum of law).

The thrust of the argument in the TBA Memorandum of Law with respect to what constitutes banking, the business of banking or the exercise of banking privileges is that integral to any definition of banking is the concept of the acceptance of demand deposits and the issuance of checks.  Because banking privileges should be restricted to banks, the TBA argues that the credit union should not exercise them; if, however, credit unions may exercise such traditional and historical prerogatives of banking, then the TBA argument is that such credit unions should become subject to all laws pertaining to banking, including the Texas constitutional prohibition against branch banking contained in article 16, section 16 of the Texas Constitution.

## IV.

## DISCUSSION OF TEXAS LAW

A.   The Legal Status of Credit Union Share Drafts In Texas.

You have raised the question of whether a state chartered credit union can participate in share draft programs in Texas. There is no specific provision in the Credit Union Act or any other state statute which specifically authorizes a credit union to engage in share draft activities.

The National Credit Union Administration has given the following definition:

> 'Share draft' means a negotiable or non-negotiable draft or other order which is payable through a bank and is used to withdraw shares from a share draft account.

42 Fed. Reg. 11248 (1977).

Section 3.104 of the Texas Business and Commerce Code (Uniform Commercial Code) describes what are negotiable instruments and defines the various types of negotiable instruments. Section 3.104 provides:

(a) Any writing to be a negotiable instrument within this chapter must

(1) be signed by the maker or drawer; and

(2) contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this chapter; and

(3) be payable on demand or at a definite time; and

(4) be payable to order or to bearer.

(b) A writing which complies with the requirements of this section is

(1) a "draft" ("bill of exchange") if it is an order;

(2) a "check" if it is a draft drawn on a bank and payable on demand;

(3) a "certificate of deposit" if it is an acknowledgement by a bank of receipt of money with an engagement to repay it;

(4) a "note" if it is a promise other than a certificate of deposit.

(c) As used in other chapters of this title, and as the context may require, the terms "draft", "check", "certificate of deposit" and "note" may refer to instruments which are not negotiable within this chapter as well as to instruments which are so negotiable.

Clearly a share draft can be a negotiable instrument, but it would not be a check according to Section 3.104(b)(2) because it only is a 'check' if it is a draft drawn on a bank

and payable on demand." This share draft is not drawn on a bank and may or may not be paid on demand.

The Texas Credit Union Act is codified as Article 2461-4.01, et seq., V.T.C.S. Article 2461-4.01 contains general powers given to credit unions and pursuant to that provision, the credit union may:

> (1)  make contracts;
>
> . . . .
>
> (6) receive from its members payments on shares or deposits to conduct Christmas clubs, vacation clubs, and other thrift programs for the membership;
>
> . . . .
>
> (18) collect, receive, and disburse money in connection with the sale of travelers checks, money orders, and similar instruments, and for other purposes that may provide benefit or convenience for its members, and for those purposes, levy incident charges.

Article 2461-4.02, V.T.C.S., grants credit unions the following incidental powers:

> A credit union may exercise all powers necessary or appropriate to accomplish the purposes for which the credit union is organized. A credit union may exercise the powers granted corporations organized under the laws of this state, including those powers necessary or requisite to enable the credit union to promote and carry on most effectively its purposes.

The Credit Union Act does not specify the manner in which credit union members may withdraw funds from deposit accounts, but leaves that matter up to the individual credit union to determine. Article 2461-6.03 provides:

> Deposit accounts, if any, are operated in accordance with the policies and conditions prescribed by the board of directors.

As noted before, the act is silent as to the question of share drafts, but the act grants credit unions broad powers which may possibly be construed to permit the use of share draft accounts.

The Texas Banking Code codified as Article 342-101, et seq., V.T.C.S., does not contain a specific prohibition to prevent a credit union from providing share draft accounts. Article 342-902, V.T.C.S., is the unauthorized banking statute which provides in part:

> Unauthorized Banking-Advertising-Private Banks-Penalty.
>
> It shall be unlawful for any person, corporation, firm, partnership, association or common law trust:
>
> (1)  To conduct a banking or trust business or to hold out to the public that it is conducting a banking or trust business; or
>
> (2)  To use in its name, stationery or advertising, the term "bank," "bank and trust," "savings bank," "certificate of deposit," "trust" or any other term or word calculated to deceive the public into the belief that such person, corporation, firm, partnership, association, common law trust, or other group of persons is engaged in the banking or trust business.
>
> Provided, however, that this Article shall not apply to (1) national banks; (2) state banks; (3) other corporations heretofore or hereafter organized under the laws of this state or of the United States to the extent that such corporations are authorized under their charter or the laws of this state or of the United States to conduct such business or to use such term; and (4) private banks which were actually and lawfully conducting a banking business on the effective date of this Act so long as the owners of such bank, their successors or assigns, shall continuously conduct a banking business in the city or town where such private bank was domiciled on the effective date of this Act; provided, however, that such private banks shall include the word "Unincorporated"

in their firm or business names and such word
shall be prominently set out upon the stationery
and in all the advertising of such private banks."

(Emphasis added).

State chartered credit unions are organized under the
laws of Texas and are authorized to enter into contracts
and enter into certain commercial paper transactions.  It
would appear that the Legislature has exempted credit unions
from the prohibition contained in Article 342-902, V.T.C.S.

Additional support for the credit union's position is
present in Article 2461-6.02, V.T.C.S., which provides in part:

(a) Share accounts consist of payments
made by members on shares, all of which are
common shares of one class, subscribed, paid
for, and transferred in a manner prescribed
by the bylaws.

Article 2461-2.03(c) vests in the Commissioner the authority to
investigate inter alia, the by-laws of a credit union to
determine whether such conform with the Act; article 2461-2.06
allows for amendment of the by-laws upon application to and
approval by the Commissioner.  Pursuant to this statutory
authority, the Commissioner with the approval of the Commission
promulgated as a part of the standard by-laws, section 6.02(3),
which provides in pertinent part:

[T]he board of directors shall have the
right at any time to prescribe rules
regarding remote withdrawal of shares
and/or deposits in accordance with
regulations promulgated by the Credit
Union Commissioner.

(Emphasis added).

Utilizing similar authority, the Attorney General of
North Carolina issued an opinion on October 28, 1975, in
which he stated:

Our conclusion that share drafts are
permissible in North Carolina is based
on the power granted to credit unions
to provide for the transfer and with-
drawal of shares in such manner as the
by-laws prescribe.  A share draft is a
method of transferring or withdrawing

> shares.  Further, share drafts would
> serve to facilitate the purchase of goods
> and services by the members by making
> their funds, represented by shares, more
> readily accessible.  Share drafts, therefore,
> would be permissible under G.S. 54-109.3
> and 54-109.21.

The Attorney General of North Carolina relied on the
Uniform Commercial Code provision which distinguishes a check
from a draft and relied on the provision of the North Carolina
Credit Union Act which provided that by-laws would contain
manner by which shares could be transferred.  The Attorney
General of Utah has also issued a similar opinion, dated
September 10, 1975.

B.  Article 16, Section 16, Texas Constitution.

You have also raised the question that if share drafts are
permissible under Texas law, does the use of a share draft
program subject the credit union to the provisions of article
16, section 16 of the Texas Constitution.  Article 16, section
16 provides:

> The Legislature shall by general laws, author-
> ize the incorporation of corporate bodies with
> banking and discounting privileges, and shall pro-
> vide for a system of State supervision, regulation
> and control of such bodies which will adequately
> protect and secure the depositors and creditors
> thereof.
>
> No such corporate body shall be chartered
> until all of the authorized capital stock has
> been subscribed and paid for in full in cash.
> Such body corporate shall not be authorized to
> engage in business at more than one place which
> shall be designated in its charter.
>
> No foreign corporation, other than the national
> banks of the United States, shall be permitted
> to exercise banking or discounting privileges
> in this State.

To accomplish the constitutional mandate, the Legislature
enacted the Texas Banking Code of 1943, codified as Article 342-
101, et seq., V.T.C.S.  Article 342-903 of the Banking Code
contains a prohibition against branch banking.  In Texas

Attorney General Opinion No. WW-838-A (1961), it was held that Article 342-903 does not prohibit credit unions from establishing branch offices.  The opinion states:

> While it is immediately apparent from the above provisions that credit unions exercise two of the most important functions of banking, the receiving of deposits and the lending of money, it must be recognized that credit unions or associations are not "banks" as that term is defined in the Texas Banking Code of 1943 (Article 342-101 et seq., V.C.S.) or as that term is commonly used and understood.  Furthermore, the operations of a credit union in receiving deposits or lending money are substantially different from the corresponding operations of a commercial bank, and in fact, the functions and underlying concept of a credit union are basically different from those of a commercial bank.
>
> . . . .
>
> We therefore conclude that the basic differences in the business transacted by a commercial bank and a credit union make inapplicable to credit unions that portion of the Banking Code prohibiting a State bank from engaging in business in more than one place.

Id. at 2-3.

Furthermore, it should be noted that the Legislature in enacting Article 2461-2.08, V.T.C.S., expressly authorized branch offices.  Article 2461-2.08 provides:

> A credit union shall maintain a principal place of business and shall file with the commissioner a statement specifying the post office address of its principal place of business.  If a credit union gives the commissioner prior written notifications, a credit union may establish at locations other than its principal place of business additional offices that are reasonably necessary to furnish services to its members.

Article 16, Section 16 of the Texas Constitution applies only to "corporate bodies with banking and discounting privileges" which have been chartered after "all of the authorized capital

stock has been subscribed and paid for in full in cash."
Article 16, Section 16 should not be construed to apply to
credit unions because credit unions are not "corporate
bodies with banking and discounting privileges" and because
credit unions do not have "authorized capital stock."

In a similar situation, the Supreme Court of Texas
determined that as there was no prohibition against a savings
and loan association having a branch office, as was the case
with banks, savings and loan associations could branch.
Southwestern Savings & Loan Association of Houston v. Faulkner,
331 S.W.2d 917 (Tex. 1960).

As to the "authorized capital stock" provision of Article
16, Section 16, Texas credit unions, unlike banks, do not
have a stated authorized capital stock. See V.T.C.S. art.
2461-6.01. In essence, a credit union is a non-profit corpor-
ation with a limited membership.

The following comparison was made in Texas Attorney
General Opinion WW-838-A (1961):

> The statutes and the nature of the business
> conducted by commercial banks and credit
> unions respectively, clearly contemplate that
> a commercial bank will conduct its functions
> in a specific structure, its banking house,
> and indeed in everyday language the word "bank"
> brings to mind the massive columns, granite
> or marble facade and austere dignity of the
> buildings favored in previous years or the glass
> and aluminum, the drive-in windows and contem-
> porary atmosphere of more recent design. A
> credit union, on the other hand, ordinarily
> serves its members from an office or space
> rented or set aside in the plant or public
> building housing its members.
>
>         . . . .
>
> It is easy to imagine that a credit union
> sponsored by a company with more than one
> plant would have difficulty serving its members
> if it could not maintain some type of facility,
> or transact business at the various plants
> where a part of the members work. It is diffi-
> cult to conceive of any such activity on the

part of credit unions resulting in the
concentration of financial power which the pro-
vision against branch banking contained in
Article 16, Sec. 16 of our Constitution was
apparently designed to guard against.

Id. at 3.

## CONCLUSION

We believe that the question of whether a state-
chartered credit union may lawfully engage in share draft
programs is very close.  The problem is that both the Credit
Union Act and the State Banking Code are silent on this
issue. The Uniform Commercial Code indicates that a share
draft is not a check.  This coupled with the absence of any
specific prohibition in state law and the substantial authority
from other states leads us to believe that the Texas courts
will probably conclude that state-chartered credit unions
may engage in share-draft programs.

The constitutional branching question does not appear
to present a "valid" issue.  As pointed out above, the legal
requirements for the establishment of a credit union differ
from that of a bank.  The specific requirements contained in
Article 16, Section 16, do not fit the basic structure of
a credit union.

## S U M M A R Y

Texas courts will probably conclude the
use of share draft programs by credit unions
is permissible under present Texas law.

Very truly yours,

JOHN L. HILL
Attorney General of Texas

APPROVED:

DAVID M. KENDALL, First Assistant

C. ROBERT HEATH, Chairman
Opinion Committee

jst